## UNITED STATES DISTRICT COURT
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BRIAN WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 2:18-cv-01135-JHE |
| ROBERT L. WILKIE, SECRETARY OF | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| VETERAN AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

On July 23, 2018, Plaintiff Brian Wilson ("Wilson" or "Plaintiff") filed this employment discrimination action against his former employer, the Secretary of the United States Department of Veteran Affairs (the "Secretary" or "Defendant"),[2] alleging he was subjected to disparate treatment and harassment on the basis of his race and sex and in retaliation for submitting Equal Employment Opportunity ("EEO") complaints. (Doc. 1). The Secretary has moved to dismiss Wilson's amended complaint, (doc. 26), and, in the alternative, for summary judgment on Wilson's claims. (Doc. 27). Wilson opposes that motion, (doc. 32), and the Secretary has filed a reply in support, (doc. 33). The motion is fully briefed and ripe for review. For the reasons stated more fully below, the Secretary's motion is **GRANTED**.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 22).

[2] Wilson originally sued Peter O'Rourke, who was at the time Acting Secretary of Veterans Affairs. (*See* doc. 1). Wilson's amended complaint, the operative pleading in this action, names the current Secretary of Veterans Affairs. (*See* doc. 26).

# I. Legal Standards

## A. Motion to Dismiss

The Secretary has moved to dismiss all or part of Wilson's amended complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

### 1. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction, with the power to hear only cases authorized by the Constitution or by statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1), a party may move the court to dismiss a case if the court lacks jurisdiction over the subject matter of the case. Even when a party does not assert a jurisdictional challenge, "a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005). Simply put, a federal court is powerless to act beyond its constitutional or statutory grant of subject-matter jurisdiction. *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). Regardless of how the issue came before the court, a plaintiff, as the party invoking jurisdiction, bears the burden of establishing the court's subject-matter jurisdiction. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994).

A challenge to a court's subject-matter jurisdiction may come by way of a facial attack or a factual attack:

> Facial attacks on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.

*Garcia v. Copenhaver, Bell & Assocs., M.D.s*, 104 F.3d 1256, 1261 (11th Cir. 1997) (citations omitted).

Because the Secretary relies on matters outside the pleadings, (*see* doc. 28 at 12-13) (citing doc. 27-2 at 2), he raises a factual challenge. Under a factual attack, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (per curiam) (citation omitted). Indeed, "[i]n the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists." *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002); *Motta v. United States*, 717 F.3d 840, 844 (11th Cir. 2013). However, a court may only find that it lacks subject matter jurisdiction "if the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (citations omitted). When a jurisdictional challenge implicates the merits of the plaintiff's claim, the court must "find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (citations omitted). This ensures "a greater level of protection for the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . both of which place great restrictions on the district court's discretion." *Id.* (citations omitted) (alterations in original).

### 2. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citations and internal

quotation marks omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citing *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (citations and internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950.

The court accepts all factual allegations as true on a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). However, legal conclusions unsupported by factual allegations are not entitled to that assumption of truth. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1950.

### B. Motion for Summary Judgment

The Secretary alternatively moves for summary judgment under Federal Rule of Civil Procedure 56. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Factual Background[3]

Wilson is a white male who worked as a Police Sergeant at the VAMC in Birmingham, Alabama. (Doc. 27-1 at 57). Wally Walfield, also a white male, is the Deputy Chief of Police at the VAMC and is Wilson's first level supervisor, and Yolanda Motley, a black female, is the Chief of Police at the VAMC and is Wilson's second level supervisor. (*Id.*). Wilson had filed two EEO complaints (one on June 19, 2014 and another on April 7, 2015), alleging claims of a hostile work environment, harassment, and a proposed removal. (Doc. 27-6 at 6). Wilson settled his claims with the VA. (*Id.*).

Since 2014, Wilson had submitted to Motley requests to attend the Firearms Instructor Course ("FIC"). (Doc. 27-6 at 6). Motley told Wilson she would consider his requests, but instead she sent other officers to the course. (*Id.*). In February 2016, Motley told Wilson that Sgt. Paul Townes, another white male, was a better candidate because Townes already took the Instructor Development Course ("IDC") and only needed to take the FIC to be qualified to teach firearm instruction, but Wilson needed to take the FIC and the IDC to qualify. (Docs. 27-1 at 58-59; doc. 27-6 at 6). However, Motley later allowed Quinton Burrows, a black male with no prior EEO activity, to attend the course despite the fact that he also needed two classes to qualify, and Burrows was allowed additional rounds and time to qualify. (Doc. 27-1 at 20; doc. 27-2 at 8; doc. 27-6 at 6). Motley testified that at the time of Wilson's request, a disciplinary action was pending against Wilson, so he was not a good department representative. (Doc. 27-6 at 6). Also, the VA had reassigned a program coordinator position that had been assigned to Wilson after he failed to perform the job duties. (*Id.* at 7).

---

[3] Although there are three unique standards under which the Secretary seeks to proceed, since the undersigned concludes that the summary judgment standard properly applies, as discussed further below, the facts in this section are presented in the light most favorable to Wilson, with all reasonable inferences drawn in his favor.

Beginning on May 19, 2016, Wilson was scheduled to work from 6:00 p.m. until 6:00 a.m. the next day. (Doc. 27-6 at 8). During the shift, the VA conducted a fire drill at 4:14 a.m. (*Id.*). Wilson responded to the fire drill without a fire extinguisher as he was required. (Doc. 27-6 at 8). Upon arriving, Wilson stated to the Safety Manager, Michael Asdel: "I am tired of this shit, and I know you can conduct a fire drill by other means." (Doc. 27-1 at 61; Doc. 27-6 at 8). Asdel asked Wilson if he could sign in, and Wilson responded, "Yes," and then turned around and said, "I am done with you." (Doc. 27-6 at 8). He then left without ensuring that patients and staff were safe and knew where to go. (*Id.*). Walfield saw that Wilson had not taken the fire drill seriously and cursed at the safety manager. (*Id.* at 7). Asdel testified that Wilson exhibited a hostile and negative attitude. (*Id.* at 8). Motley was out on leave at the time, so Walfield wrote a letter charging Wilson with being disrespectful towards a co-worker and failing to perform his assigned duties. (*Id.*; doc. 27-2 at 32-33; doc. 27-4 at 30-31). Walfield recommended a fourteen-day suspension without pay. (Doc. 27-2 at 32-33; doc. 27-6 at 8). On July 26, 2016, the Interim Assistant Director Garth Miller sustained the recommendation and suspended Wilson for fourteen days for being disrespectful. (Doc. 27-4 at 34; doc. 27-16 at 6).[4]

On October 28, 2016, Wilson patted Townes on the back during a conversation and Townes slapped Wilson across the side of his face, knocking Wilson's glasses off. (Doc. 27-1 at 59; doc. 27-6 at 7). Townes explained that he had grown tired of Wilson constantly hitting him. (Doc. 27-6 at 7). Wilson reported the incident to Walfield. (*Id.*). Motley directed Walfield to initiate an

---

[4] In 2012, the VA suspended Wilson for three days for improper conduct and dereliction of duty. (Doc. 27-6 at 8). Motley proposed the fourteen-day period as part of an escalating form of discipline. (Doc. 27-16 at 4). The VA's management performed the *Douglas* Factors analysis in determining an appropriate penalty to impose for Wilson's misconduct. (Doc. 27-6 at 8); *see Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305 (1981) (stating criteria that supervisors must consider in determining an appropriate penalty to impose for an act of employee misconduct).

administrative board investigation[5] into Wilson's allegations against Townes. (*Id.*). Wilson did not provide information about the incident to an investigating police detective because Wilson believed Motley initiated an investigation to suspend Wilson in retaliation for his EEO activity. (*Id.*). Wilson demanded Motley remove Townes from duty. (Doc. 27-1 at 60; doc. 27-6 at 7). The administrative investigation board investigation revealed coworkers had witnessed Wilson bullying Townes for two years prior to the altercation, including verbally abusing Townes and forcefully slapping Townes on the back. (*Id.*). The VA verbally counseled both Wilson and Townes for the altercation. (*Id.*).

Wilson alleges that Motley created a hostile work environment in which he, his co-workers, and managers believed the VA permits employees to disrespect, harass, and target Wilson. (Doc. 27-1 at 61). Wilson reported harassment to Walfield, who told Wilson he was imagining the harassment and created his own problems by complaining. (Doc. 27-6 at 9). Wilson claimed that Motley continually refused to move him out of the hostile work environment, but Motley testified that she was not aware of Wilson's harassment complaints. (*Id.*). Motley testified that Wilson directed his concerns to Walfield or Motley's supervisor and never reported harassment to Motley. (*Id.*). Walfield also testified that Wilson never reported any harassment to him and was unaware of any concerns directed to Motley. (*Id.*).

---

[5] There is some question as to the nature of the inquiry into Wilson's conduct. Wilson claims it is "unclear" whether this inquiry was an administrative board investigation, a "fact finding," or both, (doc. 32 at 4), which is consistent with the evidence. During the administrative proceedings, Wilson claimed the inquiry was an administrative board investigation, while Motley denied it was and characterized the inquiry as fact-finding. (Doc. 27-6 at 7). Wilson does not expound on the significance of one versus the other. In any event, taking the evidence favorably to Wilson, the undersigned assumes the inquiry was the apparently more serious administrative board investigation.

On November 21, 2016, Wilson contacted an EEO Counselor, and, on December 31, 2016, he filed a formal complaint (No. 2001-0521-2017100739). (Doc. 27-1 at 55-56). On February 23, 2017, the VA (Office of Resolution Management) notified Wilson that his complaint raised a hostile work environment claim based on his race, sex, and reprisal as demonstrated by: Motley's denial of Wilson's training request; Motley's initiation of the investigation of Wilson related to the altercation with Townes; the VA's fourteen-day suspension of Wilson; and Motley's alleged refusal to address Wilson's concerns and work with him because Motley filed an EEO complaint against Motley. (*Id.* at 56).

As part of the investigation into this complaint, Officer Armando Jones (Hispanic male) and VA Lead Policy Officer Rutherford Hill (black male) provided sworn statements. Jones stated: "Since the initial EEO [complaint] against Chief Motley; [Wilson] has not received fair treatment in the department. They are always trying to find fault in his daily activities. [Wilson] does not have a future in this department under the current management." (Doc. 27-3 at 43). Jones also stated that due to Wilson's prior EEO complaint, Motley was trying to fire him. (Doc. 27-3 at 45). Hill stated that Motley targeted Wilson for unfair treatment and unwarranted discipline. (Doc. 27-3 at 49). He testified that:

> I thought it would be a good gesture for [Motley] to reach out to Wilson to try to improve their relationship and make [Wilson] . . . feel as if [he is a] part of the "team." Chief Motley replied . . ., "You must have bumped your motherfucking head"! "He filed an EEO complaint".

(Doc. 27-4 at 1). Hill also stated that on social occasions outside of work, Motley told Hill that she disliked Wilson and that she stated "they (Caucasians) have been doing whatever they want to do as far as placing others of their race in positions of authority, and her intentions are to do the same." (Doc. 27-3 at 50). Wilson also indicated in his sworn statement that Officer Rick Yerby (white male) told him he was "right that management is targeting him for discipline." (Doc. 27-2

at 10). Yerby provided a sworn statement indicating that he had "[n]o idea" if the incidents of which Wilson complained were motived by Wilson's race, gender, or prior EEO activity. (Doc. 27-3 at 37).

On April 25, 2018, the VA issued a final agency decision ("FAD"), stating that Wilson raised claims of disparate treatment based on race and sex, and harassment based on his race, sex, and retaliation as demonstrated by the four events the VA identified in its previous letter. (Doc. 27-6 at 5). In the FAD, the VA determined that Wilson "failed to prove disparate treatment or harassment on the bases of race, sex or prior EEO activity." (Doc. 27-6 at 15-17).

On April 17, 2017, Wilson was charged with being absent from work without leave ("AWOL"). (Doc. 27-15 at 23). Wilson was scheduled to work from 6:00 p.m. to 6:00 a.m. beginning on February 13, 2017, but Wilson wanted to use his leave time for that shift. (Doc. 27-15 at 23; doc. 27-17 at 14). The VA's policy required Wilson to have accumulated sufficient leave time to take leave. (*See* doc. 27-17 at 14). Under the VA's policies, an employee has an absolute right to take leave, subject to the right of the department head to fix the time at which that leave may be taken. (Doc. 27-17 at 13). Previously-approved leave may also be administratively cancelled in an unusual or emergency situation. (*Id.*). On January 30, 2017, Wilson asked Walfield for the time off. (Doc. 27-17 at 14). Officer Otis Davis testified that he overheard Wilson ask Walfield for time off. (Doc. 27-18 at 1). Walfield responded by asking Wilson if someone was covering Wilson's shift for the time he would be gone, and Wilson responded that another officer would cover the shift. (*Id.*). Walfield approved the request stating that he was only concerned with somebody covering the shift. (*Id.*). The VA then denied the leave because Wilson had insufficient leave time balance. (Doc. 27-15 at 23). Wilson stated this was never communicated to him. (Doc. 27-17 at 14-16). Wilson was absent for the shift. (*Id.*). The VA

charged Wilson with being AWOL for twelve hours, and Motley proposed that Wilson be suspended for 30 days. (Doc. 27-15 at 23). On June 8, 2017, the VAMC Director, Thomas Smith, a white male, suspended Wilson for seven days without pay and fourteen days with pay. (Doc. 27-11 at 20, 22-23; doc. 27-28 at 3).

On June 15, 2017, Wilson filed an EEO complaint (No. 2001-0521-2017102931), alleging discrimination based on race and reprisal (due to the filing of an EEO complaint in April of 2015) when the VA suspended Wilson for 21 days. (Doc. 27-28 at 2-3, 6). On January 22, 2019, the VA issued a FAD, concluding that it had not discriminated against Wilson as alleged in his complaint. [6] (*Id.* at 7). On July 23, 2018, Wilson filed his Complaint in this court. (Doc. 1).

### III. Analysis

Wilson's Amended Complaint is confusing in that it does not clearly identify his claims or which facts support them. Wilson's brief in opposition to the Secretary's motion does little to clarify them either. Wilson alleged he filed his "EEO claims" addressing his grievances and his allegations reference the same factual information in the FADs. (*See* doc. 26 at 1-9). Attached to the Secretary's motion, the Secretary submitted the FADs, which clarify Wilson's claims and their underlying factual support. (*See* doc. 27-1 at 41; doc. 27-6 at 5; doc. 27-28 at 3). For the purposes of this memorandum opinion, the court construes Wilson's Amended Complaint as reasserting the claims that were identified and discussed in the FADs and which plausibly appear in the complaint, consisting of the following: (1) disparate treatment based on race and prior EEO activity for failure to select Wilson for additional training in February 2016, (doc. 26 at ¶¶ 9-13, 38; doc. 27-1 at 9);

---

[6] In the FAD, the VA noted that on September 28, 2017, Wilson amended his EEO complaint to add a claim of "denial/delay of reasonable accommodation." (Doc. 27-28 at 2). The FAD and the parties do not discuss that issue. It appears that issue has become subsumed in Wilson's contention that Motley did not address his concerns. (*See* doc. 27-1 at 41; doc. 27-6 at 5).

(2) disparate treatment based on race and prior EEO activity for Wilson's 14-day suspension in August 2016, (doc. 26 at ¶¶ 30-31, 38; doc. 27-1 at 9); (3) disparate treatment based on race and prior EEO activity, for the October 28, 2016 AIB inquiry (doc. 26 at ¶¶ 14, 16-23; doc. 27-1 at 9);[7] (4) a racially hostile work environment, based on the incidents in claims 1-3, (doc. 26 at ¶ 29-32, 38; doc. 27-1 at 9); (5) a hostile work environment based on prior EEO activity, based on the incidents in claims 1-3, (doc. 26 at ¶¶ 13, 29-32, 38; doc. 27-1 at 9); and (6) a hostile work environment based on race, resulting in the 21-day suspension, (doc. 26 at ¶¶ 34-38; doc. 27-8 at 13).[8]

With Wilson's claims defined, the next question is the appropriate standard under which to analyze them. Both parties rely heavily on the administrative record in their briefing, and Wilson attaches additional evidence in opposition to the Secretary's motion, (docs. 32-1, 32-2 & 32-3). Extrinsic evidence is incompatible with a motion under Rule 12(b)(6), *Starship Enterprises of Atlanta, Inc. v. Coweta Cty., Ga.*, 708 F.3d 1243, 1253 n.13 (11th Cir. 2013), but consistent with the Secretary's alternative motion under Rule 56.[9] If anything, then, the alternative summary judgment motion is the appropriate one to analyze.

The potential obstacle to considering the Secretary's motion for summary judgment is the procedural posture of this case. The Secretary filed the motion in lieu of a responsive pleading to

---

[7] The complaint and FAD only arguably supports any of these incidents as independently-actionable claims, but giving Wilson the benefit of the doubt, the undersigned considers them.

[8] At the administrative level, Wilson also argued some of these incidents were related to his sex. (*See, e.g.,* doc. 27-1 at 56). He does not raise sex-related claims in his complaint, (*see* doc. 26), and although the Secretary has moved for summary judgment on any sex-based discrimination, (*see* doc. 27), Wilson includes neither arguments nor factual information to support sex discrimination. Because it does not appear Wilson has raised any sex-based discrimination claims (and because the record contains no evidence to support them even if he did), this memorandum opinion discusses only race- and retaliation-based claims.

[9] As discussed above, a court may consider extrinsic evidence in support of a motion under Rule 12(b)(1). The only claim the Secretary challenges on jurisdictional grounds is Wilson's

Wilson's amended complaint, and the record before the court on that motion does not contain any discovery from this action. Summary judgment "may only be decided upon an adequate record." *Snook v. Tr. Co. of Georgia Bank of Savannah*, 859 F.2d 865, 870 (11th Cir. 1988) (quotation marks and citation omitted). Consistent with this principle, "[g]enerally, a district court should allow discovery before ruling on a motion for summary judgment." *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1155 (11th Cir. 2018). This rule is not inflexible, though, and proceeding to summary judgment prior to discovery is within the district court's discretion. *Id.* Here, unlike most cases, the administrative proceedings provide a robust record, including numerous statements regarding the incidents at issue in this case. Crucially, Wilson does not contend any additional discovery would be necessary for the court to consider the motion—even though he could have done so under Rule 56(d), which allows "a nonmovant [to] show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . ." And it is hardly a surprise to Wilson that this alternative motion is before the court; his brief repeatedly denies the Secretary is entitled to summary judgment. (*See* doc. 32 at 1-2, 5, 9, 12-13, 17, 19, 23 & 25). Accordingly, the undersigned finds the lack of discovery in this case does not prevent the court from considering the alternative motion for summary judgment. With that in mind, each of Wilson's claims is analyzed below, broken down by the type of discrimination alleged.

### A. Race-Based Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

---

denial of training claim. As discussed below, the undersigned concludes there is no need to consider Rule 12(b)(1)'s applicability.

individual's race . . . ." 42 U.S.C. § 2000e-2(a). When a plaintiff bases his disparate treatment claims on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). Under the *McDonall Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).

### 1. Disparate Treatment – Denial of Training

Wilson argues the denial of training in February 2016 was the result of racial discrimination. The Secretary has moved to dismiss this claim as untimely and on the merits. (Doc. 28 at 15).

Because Wilson is a federal employee, he is "required to initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act." *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (citing 42 U.S.C. § 200e-16(b); 29 C.F.R. §1614.105(a)(1)). "Generally, when the claimant does not

initiate contact within the 45–day charging period, the claim is barred for failure to exhaust administrative remedies." *Shiver*, 549 F.3d at 1344 (*Brown v. Snow*, 440 F.3d 1259, 1264-65 (11th Cir. 2006)). Wilson argues his claim was timely, since he never received a definitive reply to his request for training and only discovered the unequal treatment that forms the basis of this claim on October 29, 2016. (Doc. 32 at 1). However, Wilson ignores that the claim was dismissed as untimely at the administrative level pursuant to 29 C.F.R. § 1614.107(a)(2), (doc. 27-1 at 41), a dismissal upheld in the FAD on this claim, (doc. 27-6 at 5). In any event, though, it is unnecessary to determine whether Wilson's denial of training claim was timely because it fails as a standalone disparate treatment claim for several other reasons.[10]

First, as the Secretary states, (doc. 33 at 9), denial of training does not appear to be an independently-actionable adverse employment action. To qualify as disparate treatment, an adverse employment action must "impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). A plaintiff seeking to show an adverse employment action need not show "direct economic consequences," but must demonstrate "a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* (emphasis in original).

The Secretary points to *Gloetzner v. Lynch*, 225 F. Supp. 3d 1329 (N.D. Fla. 2016), another case in which a plaintiff police officer claimed he was passed over for firearms training due to his age and that his inability to participate impacted his career.[11] (Doc. 33 at 9). In that case, the court

---

[10] Whether the denial of training forms part of a hostile work environment is discussed below.

[11] Although there are some differences between the Age Discrimination in Employment Act and Title VII, there is no meaningful analytical distinction between the statutes as to what is

found that there was no evidence that the officers' "non-selection for . . . training[] led to a decrease in his salary, changes in his work hours, or other material harm." *Id.* at 1353. The court analogized the case to another denial-of-training case, *Casey v. Mabus*, 878 F. Supp. 2d 175 (D.D.C. 2012), in which the court found that, notwithstanding the plaintiff's contention that training would have increased her potential for career advancement and enabled her to more fully carry out her duties, "absent some concrete factual allegation that [the plaintiff's] training deficit imposed a tangible harm on the terms, conditions, or privileges of her employment," it was not an actionable claim. *Id.* Here, like *Gloetzner* and *Casey*, Wilson has not pointed to anything to support any tangible harm to him as a result of not receiving training. Accordingly, he has not established that denial of training constitutes an adverse employment action.

Second, even if denial of training were an actionable claim, Wilson cannot show that Motley denied his request based on his race. (*See* doc. 32 at 2). To demonstrate the fourth element of the disparate treatment *prima facie* case, a plaintiff must ordinarily point to comparators who are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226. Wilson offers two comparators: Townes and Burrows. Neither fits the bill.

Townes is not an appropriate comparator because, he and Wilson are both white males. (*See* doc. 27-3 at 27). Wilson cannot make out a *prima facie* case of race discrimination using a comparator of the same race, since that comparator is definitionally not outside his class. *See Lewis*, 918 F.3d at 1221. Even though he acknowledges that Townes is within his class, Wilson argues the two were treated differently as part of "a discriminatory scheme or plan." (Doc. 32 at 14). To support this, Wilson argues that Motley sent Townes to the FIC instead of Wilson because,

---

an adverse employment action. *See Humphrey v. Napolitano*, 847 F. Supp. 2d 1349, 1354 (S.D. Fla. 2012), *aff'd,* 517 F. App'x 705 (11th Cir. 2013).

based on a statement from Ami Latham (Townes' ex-girlfriend) "no one in the department liked [Wilson]." (Doc. 32 at 2) (citing doc. 32-1 at 1). Wilson points to Latham's statement indicating "[Townes] and [Walfield] were hoping that by sending [Townes] instead, it would anger [Wilson] and make him do something 'stupid' that [Walfield] could then punish [Wilson] for" and that "[Walfield] liked to mess with [Wilson] every chance he got." (Doc. 32 at 14) (citing doc. 32-1 at 2). But "'[p]ersonal animosity is not the equivalent of [race] discrimination,'" and Wilson "'cannot turn a personal feud into a . . . discrimination case . . . .'" *Succar v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) (per curiam) (quoting *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986)). Townes is simply not an appropriate comparator.

Wilson also contends Motley altered requirements to allow Quinton Burrows, a less-qualified black employee, to be promoted to training sergeant, and that Burrows would (like Wilson) have to attend two classes to qualify as a firearms instructor. (Doc. 27-1 at 20; 27-2 at 8). But Wilson primarily offers this to show that Motley's purported rationale for allowing *Townes* to take the classes is a lie, not to show that Motley selected *Burrows* for training over him. To the extent Wilson's response argues Motley treated Burrows more favorably than him by altering the requirements Burrows would have to meet (an allegation that does not appear in his complaint), Wilson includes no information about Burrows beyond his race and sex that would allow a meaningful comparison between the two. As the Eleventh Circuit has stated, the analysis of whether a comparator is "similarly situated in all material respects" depends on "substantive likenesses," including such factors as whether the comparator "share[s] the plaintiff's employment or disciplinary history." *Lewis*, 918 F.3d at 1227-28. The undisputed evidence is that Wilson had a disciplinary action pending against him when he was denied training, but there is no evidence that supports Burrows had a similar disciplinary history. This alone distinguishes the two and

precludes Wilson from relying on Burrows as a comparator. Furthermore, in his statement at the administrative level, Wilson also listed James Harding (white male) and Shamia Moore (black female) as comparators for whom Motley also engineered promotions by waiving requirements. (*See* doc. 27-2 at 8). Although there is not a great deal of information about either of these individuals (e.g., when they applied for training or what requirements Motley waived), and Wilson does not attempt to rely on them in this action as comparators, this indicates Motley treated both black and white coworkers better than Wilson, which undermines an inference of race discrimination. Instead, as with Townes, it supports that Motley harbored a generalized animus towards Wilson. Since there is no genuine dispute of material fact as to whether the denial of training was an independently-actionable incident of race-based disparate treatment, the Secretary is due to be granted summary judgment on this claim.

### 2. Disparate Treatment – August 2016 Suspension

Next, Wilson contends his fourteen-day suspension in August 2016 following the fire drill was race-based discrimination. (Doc. 32 at 9-11). Unlike the denial of training, this qualifies as an adverse employment action. *See Evans v. Alabama Dep't of Corr.*, 418 F. Supp. 2d 1271, 1276 (M.D. Ala. 2005) (finding ten-day suspension without pay was adverse employment action).

That said, Wilson identifies no information to support the allegedly harsh punishment he received for disrespecting a coworker was in any way related to his race. Instead, Wilson argues it was disproportionate to the seriousness of the offense. (Doc. 32 at 16). The only comparator Wilson offers here is Townes, who received a more lenient punishment for his physical altercation with Wilson. Again, though, Townes is the same race as Wilson, and thus not a valid comparator. *Lewis*, 918 F.3d at 1221.

Furthermore, Wilson provides no evidence that Miller, who was the decisionmaker as to Wilson's suspension, (*id.* at 34), had a race-based motive.[12]  Instead, he relies on Motley's motive, which is irrelevant since she had nothing to do with the suspension.  What is left is Wilson's argument that the fourteen-day suspension was generally unfair.  But "unfair treatment of an employee, standing alone, does not make out a Title VII case; the mistreatment must be because the employee was [white]." *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part).

Furthermore, the Secretary has identified a legitimate, nondiscriminatory reason for the suspension: Wilson's failure to perform his assigned duties, coupled with the progressive discipline required by the previous three-day suspension.  (Doc. 28 at 24-25).  Wilson's attempt to paint the suspension as pretextual by comparing it to Townes' lighter punishment for the physical altercation between the two men is a non-starter.  The misconduct at issue is different, and Wilson does not identify any prior discipline against Townes that would support an escalated punishment. While Wilson may believe that Townes should have received a harsher punishment for the altercation, that does not mean Wilson should have received a lighter punishment for his conduct during the fire drill.  And it is not Wilson's burden just to show that the Secretary's reasons for suspending him were false; he must also show that discrimination was the real reason behind the suspension.  *Hornsby-Culpepper v. Ware,* 906 F.3d 1302, 1312 (11th Cir. 2018).  Although Wilson states that the punishment was illegitimate because of its severity and the reason behind it false,

---

[12] Wilson also offers no evidence that Walfield, who recommended the suspension, had a race-based motive.

he has identified no evidence that would suggest race as a motive for it. Accordingly, this claim is due to be dismissed.

### 3. Disparate Treatment – Inquiry

Wilson's final race-based disparate treatment claim relates to the inquiry into the fight between himself and Townes. The first problem with this is that the inquiry and verbal counseling that followed do not qualify as an adverse employment action in the first place. Although "[a] reprimand that has a meaningful adverse effect on an employee's working conditions may be cognizable under Title VII," *Braswell v. Allen*, 586 F. Supp. 2d 1297, 1306 (M.D. Ala. 2008) (quoting *Keenan v. American Cast Iron Pipe Co.,* 707 F.2d 1274, 1277 (11th Cir. 1983)), Wilson provides no evidence that the inquiry and counseling resulted in any tangible harm to him, nor any reason why a verbal reprimand would have future harmful implications. With no tangible consequences from the reprimand, Wilson cannot base a claim on it. *See Davis*, 245 F.3d at 1239; *Morales v. Georgia Dep't of Human Res., Dep't of Human Res., Div. of Family & Children Servs.*, 446 F. App'x 179, 184 (11th Cir. 2011) (documentation of counseling not adverse employment action when there was no evidence it would affect plaintiff's salary, job status, or future pay raises); *Wallace v. Georgia Dep't of Transp.*, 212 F. App'x 799, 801 (11th Cir. 2006) (written reprimand not adverse employment action for disparate treatment purposes when it did not cause employee to suffer lost pay or benefits or result in denial of job promotions).

Furthermore, even if the inquiry and reprimand were adverse employment actions, Wilson offers nothing to show either was race-based. Wilson apparently alleges it was discriminatory because he and Townes were disciplined differently, as part of a scheme between Walfield and Wilson. (Doc. 32 at 4-5). Specifically, Wilson points to Latham's email stating that Walfield and Townes conspired to "thwart" Wilson's EEO claims by reprimanding Townes in connection with the incident where Wilson patted Townes on the back. (Doc. 32-1 at 2; doc. 32-1 at 1-2). Latham

explained that Walfield and Townes agreed that "it would look good for them to be able to say they 'punished' Townes," but the reprimand "didn't really mean anything and would be pulled from his file after three months." (*Id.*). Nothing in this scheme relates to Wilson's race. Nor, for that matter, would phantom discipline meted out to *Townes* matter as to how the inquiry affected *Wilson*. Wilson also points to Walfield's testimony that Motley suggested initiating the inquiry and his own statement that Motley engineered the inquiry "to attempt a suspension" against him." (*Id.*) (citing doc. 27-2 at 9; doc. 27-3 at 3). But, again, Wilson does not cite to any evidence supporting his race was the motive behind this. Wilson does not even attempt to offer a comparator for this claim, much less one similarly situated in all material respects. Accordingly, the Secretary is entitled to summary judgment on this claim.

### 4. Racially Hostile Work Environment (Denial of Training, August 2016 Suspension, Inquiry)

Title VII does not explicitly mention harassment, but courts have recognized that the phrase "terms, conditions, or privileges of employment" includes hostile work environments. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To establish a harassment claim based on race, Wilson must show:

> (1) that [he] belongs to a protected group; (2) that [he] has been subjected to unwelcome . . . harassment; (3) that the harassment was based on [his race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing *Mendoza*, 195 F.3d at 1245). Instances of harassment are "considered both cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (citing *Mendoza*, 195 F.3d at 1242).

Title VII "does not prohibit harassment alone, however severe and pervasive." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir.2007). Accordingly, "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (citation omitted). As discussed above, there is no evidence to support that any of the incidents of harassment he identifies were based on his race rather than animus towards him as an individual.

To those allegations, Wilson also adds an argument that Motley refused to address his concerns and work with him in part based on his race. (Doc. 27-1 at 41; doc. 27-6 at 5). The only concrete example of this Wilson identifies is an email dated January 17, 2013, in which Wilson wrote about an altercation with Sergeant Copeland, after which Wilson threatened to report Copeland. (Doc. 32 at 5; doc. 32-2). Copeland responded to the threat, "[Motley] ain't going to do anything." (*Id.*). Motley's response to the email indicates that she "will address this matter." (Doc. 32-2). Wilson's email does not show that Motley refused to address Wilson's concerns or work with him because of his race. Wilson does not identify any other incidents where Motley ever refused to address his concerns or work with him. (*See* doc. 32 at 2-5). Furthermore, even if there were evidence that Motley's general failure to work with Wilson was race-based, it is not an adverse employment action. *Cf. Johnson v. Weld Cnty.,* 594 F.3d 1202, 1216 (10th Cir. 2010) (giving plaintiff the "cold shoulder" was not an adverse employment action even under more lenient standard applicable to retaliation claims). To the extent Wilson claims Motley's refusal to move him out of his hostile work environment was itself an indication of a hostile work environment, this circular argument does not solve the basic problem that Wilson has not identified incidents that would support a hostile work environment in the first place. The Secretary is due summary judgment on this claim as well.

## B. Retaliation-Based Claims

For a retaliation claim, a plaintiff's *prima facie* case requires him to demonstrate that (1) he engaged in statutorily protected activity, (2) that he suffered a materially adverse action, and (3) that there was a causal relationship between the complaint and the adverse action. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016). For retaliation purposes, a "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (internal quotation marks omitted) (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). A plaintiff may satisfy his burden "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000)). Once a plaintiff establishes a *prima facie* case, "'the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.'" *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (quoting *Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1196 (11th Cir. 1997)). Then, as with a disparate treatment claim, the burden shifts back to the plaintiff to show that the defendant's "proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Id.* (citing *Olmsted*, 141 F.3d at 1460).

It is undisputed that Wilson engaged in protected activity by filing EEO complaints on June 19, 2014, and April 7, 2015. Therefore, the undersigned considers only the other two retaliation elements as to each alleged incident.

## 1. Disparate Treatment – Denial of Training

To the extent he argues it is independently actionable, Wilson does not defend his claim that Motley denied training based on prior EEO activity in his response to the motion. Therefore, he has abandoned that claim. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

Even if Wilson had not abandoned that claim, it would nevertheless fail. At a minimum, Wilson has failed to allege or support a causal connection between his EEO complaints and the denial of training. (*See* doc. 32 at 12-14) (discussing the causal connection element, but only as to other alleged adverse actions).

## 2. Disparate Treatment – August 2016 Suspension

Wilson also provides no evidence of a causal connection between his August 2016 suspension and his prior EEO complaints. To do so, he was required to show "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (citation and internal alterations omitted). As noted above, Miller was the decisionmaker as to Wilson's fourteen-day suspension. Just as Wilson provides no evidence to support Miller had any racial

animus towards Wilson, he also fails to cite any evidence suggesting Miller was aware of his prior EEO activity.[13] Although the statement from Hill that Motley would not work with Wilson because of his EEO complaint might support *Motley's* motive, as a general matter, to discipline Wilson in retaliation for protected activity, it does nothing to inform *Miller's* motive. Additionally, for similar reasons to those discussed above, (*see* Section III.A.2), Wilson cannot demonstrate that the legitimate, nondiscriminatory reason for the fourteen-day suspension was pretextual; he has provided no evidence to support retaliation as the true reason for the suspension.

### 3. Disparate Treatment – Inquiry

As for the inquiry and verbal counseling, although the *Burlington* standard for materially adverse actions in the retaliation context is more relaxed than the standard that applies to disparate treatment claims, courts have routinely held an investigation followed by a verbal reprimand that

---

[13] Although Wilson does not identify this evidence himself, the record reflects Walfield was aware of Wilson's prior EEO activity at the time of his July 7, 2017 interview under oath because he had heard it "by word of mouth." (Doc. 27-2 at 54, 60-61). A reasonable inference from this is that Walfield was aware of Wilson's prior EEO activity at the time of the August 2016 suspension. This might support a causal connection based on temporal proximity if the undersigned accepted Wilson's contention that his protected activity continued through May 2016, around a month before the suspension. However, even if Wilson had demonstrated Walfield had a retaliatory based motive, he was not the final decisionmaker—Miller was.

> [I]n some cases, a . . . recommendation by a party with no power to actually [discipline] the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's [discipline] . . . However, as we have recently explained, this causation must truly be direct. When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to [discipline] the employee.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). Wilson offers neither evidence nor argument to connect Walfield's motive in submitting the proposal to Miller's decision.

produces no tangible adverse consequences is not the kind of action that would dissuade a reasonable worker from pursuing a charge of discrimination. *See e.g., Morales*, 446 F. App'x at 183; *King v. Louisiana,* 294 F. App'x 77, 85 (5th Cir.2008) (conduct including verbal reprimands did not constitute adverse employment actions). Wilson does not identify any authority or evidence that suggests otherwise.

In addition to this, there is no evidence to support that either was causally connected to Wilson's prior EEO activity. "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Cooper Lighting, Inc.*, 506 F.3d at 1364 (citation omitted). The Eleventh Circuit has held that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Id.* Wilson's prior protected activity took place, at the latest, in June 2015—more than a year prior to the incident giving rise to the inquiry.[14] To the extent Wilson relies on a scheme between Walfield and Townes to cast doubt on Wilson's *future* EEO complaint—for which Wilson first contacted an EEO counselor on November 21, 2016, and which Wilson filed on December 31, 2016, (*see* doc. 27-1 at 55-56)—that is unrelated to retaliation for *prior* protected activity, which is what Wilson alleges. *See Brathwaite v. Sch. Bd. of Broward Cty., Fla.*, 763 F. App'x 856, 861 (11th Cir. 2019) (allegedly retaliatory action not subject to an inference of causal connection based on temporal proximity when it took place prior to protected activity).

---

[14] Wilson appears to rely on the entire length of the proceeding that followed the EEO complaint to suggest that his protected activity occurred through May 2016. (Doc. 32 at 13). Even if it were appropriate to consider this entire time period for temporal proximity purposes, May 2016 is still more than four months before the October 28, 2016 incident leading to the inquiry.

### 4. Retaliatory Hostile Work Environment (Denial of Training, 2016 Suspension, Inquiry)

Wilson alleges that the he encountered a retaliatory hostile work environment as demonstrated by the same conduct as his race-based harassment claim.[15] (*See* doc. 27-1 at 56). To establish a prima facie case of retaliatory hostile work environment, Wilson must show that:

> (1) [he] engaged in protected activity; (2) after doing so, [he] was subjected to unwelcome harassment; (3) [his] protected activity was a "but for" cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of [his] employment; and (5) a basis exists for holding [his] employer liable either directly or vicariously.

*Swindle v. Jefferson Cty. Comm'n*, 593 F. App'x 919, 929 n.10 (11th Cir. 2014) (per curiam) (citing *Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012) (per curiam); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). The standard for showing allegedly adverse actions amount to a hostile work environment is the same as "'the other types of unlawful harassment" claims, rather than that for retaliation claims. *Id.* (citing *Miller*, 277 F.3d at 1275). In other words, Wilson must establish that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [Wilson's] employment or create an abusive working environment.'" *Swindle*, 593 F. App'x at 928-29 (quoting *Gowski*, 682 F.3d at 1311). The Secretary argues that Wilson cannot establish that his protected activity was a but for cause of the harassment and that the harassment was sufficiently severe and pervasive. (Doc. 28 at 19-20).

---

[15] The Secretary's arguments that the denial of training claim is unexhausted do not apply when the denial of training is considered as part of a hostile work environment. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)). "It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* As long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court . . . ." *Id.* Since it is undisputed that at least some of the conduct Wilson alleges took place within the filing period, whether Wilson exhausted the independent denial of training claim is immaterial.

For many of the same reasons discussed above, each of Wilson's alleged incidents of retaliation is fatally flawed. Even assuming Wilson could establish the denial of training was an adverse employment action for retaliation purposes, as discussed above, Wilson has failed to show a causal relationship between it and his protected activity. Wilson also cannot show a causal connection between his fourteen-day suspension and his prior EEO activity because he has failed to support Miller knew of his protected activity or had a retaliatory motive based on it. Because it resulted in essentially a slap on the wrist, the inquiry resulting in Wilson's verbal reprimand was not "sufficiently severe or pervasive to alter the terms or conditions of [his] employment." Similarly, Motley's refusal to "work with" Wilson or address his concerns—exemplified by a single, minor incident—is too vague and too trivial to support a *prima facie* case of retaliation. *See Burlington*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience"); *Johnson,* 594 F.3d at 1216. Accordingly, the Secretary is due to be granted summary judgment on this claim.

### 5. Retaliatory Hostile Work Environment (June 2017 Suspension)

Finally, Wilson alleges that the VA suspended him for twenty-one days in retaliation for filing an EEO complaint in April of 2015. (Doc. 32 at 13, 24; doc. 27-28 at 6). It is undisputed that Wilson's EEO complaint constitutes protected activity and that the suspension is an adverse employment action. (Doc. 28 at 30-31). The Secretary argues that Wilson cannot establish a *prima facie* case because he cannot show a causal link between the filing of the April 2015 EEO complaint and the June 2017 suspension and that, in any event, the VA had a legitimate, nondiscriminatory reason for suspending Wilson. (Doc. 28 at 31-33).

Here, more than two years elapsed between the EEO complaint and the twenty-one-day suspension,[16] so Wilson was required to point to other evidence of a causal connection to support his claim. *Cooper Lighting, Inc.*, 506 F.3d at 1364. Wilson attempts to show a causal link exists because "[Walfield] was known for concocting plans to thwart [Wilson's] EEO activity." (Doc. 32 at 24). First, as with Wilson's fourteen-day suspension, Walfield was not the final decisionmaker. Instead, Smith was. Although the record contains evidence that Smith knew of Wilson's prior EEO activity, (doc. 27-13 at 17), Wilson provides nothing to support Smith held any animus towards Wilson because of it, consistent with his burden. *McCann*, 526 F.3d at 1376. Even if Walfield's motive mattered, Wilson does not specifically cite anything in the record to support it; the only "plan" that appears to follow his characterization is the one detailed in Latham's email. Latham's email shows that Walfield and Townes conspired to issue a reprimand to Townes in connection with his altercation with Wilson in October 2016, (Doc. 32-1 at 2), but even viewing the email in the light most favorable to Wilson it does not support a causal connection between Wilson's protected expression and Warfield's role in the June 2017 suspension. Without a causal connection between his EEO complaint and the suspension, Wilson's claim of a retaliatory hostile work environment is due to be dismissed.

Even if Wilson had demonstrated a causal connection, he would still be unable to prove that his suspension was a pretext for discrimination. The Secretary contends the VA had a legitimate, nondiscriminatory reason for suspending Wilson: he was AWOL, and his prior disciplinary history supported a lengthy suspension under the VA's progressive discipline policy. (Doc. 28 at 31-32) (citing doc. 27-17). Wilson's rebuttal to this is that he had accrued the leave

---

[16] Or, using Wilson's argument his protected activity lasted through May 2016, more than a year elapsed.

and Walfield initially approved it and subsequently cancelled it in violation of VA policies, since there was no unusual or emergency situation prompting its cancellation. (Doc. 32 at 23-24). This, he says, rendered the suspension unwarranted. (*Id.*). Although some evidence at the administrative level is consistent with his characterization, (*see* doc. 27-17 at 14-16; doc. 27-18 at 1), and is evidence that might convince a jury that Walfield violated VA policy when he revoked his authorization for Wilson's leave, missing from Wilson's pretext argument is any evidence supporting that the real motive behind the suspension (which, again, was ultimately administered by Smith) was retaliation for protected activity. As stated above, it is insufficient to only prove that the allegedly pretextual explanation was false. *Hornsby-Culpepper,* 906 F.3d at 1312. Since Wilson has identified no evidence supporting that the suspension was based, even in part, on retaliatory animus, the Secretary is entitled to summary judgment on this claim.

## IV. Conclusion

For the reasons stated above, the Secretary's motion for summary judgment, (doc. 26), is **GRANTED**. A separate order will be entered.

DONE this 1st day of April, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE